ALEXANDER et al., Plaintiff v. STATE, Defendant

(57 N. W.2d 121)

(File No. 9215. Opinion filed February 24, 1953)

Smith, McLean & Peterson, Mankato, Minn., and Temmey & Luby, Huron, for Plaintiffs.

Ralph A. Dunham, Atty. Gen., Benj. D. Mintener, Asst. Atty. Gen. and William J. Flittie, Asst. Atty. Gen., for Defendant.

ROBERTS, P. J.   Plaintiff partners doing business under the firm name of Alexander Construction Company entered into a written contract with the State of South Dakota to do all the work and furnish all the materials required for shaping and compacting the base and bituminous surfacing of 17.44 miles of Highway No. 34 in Sanborn County according to plans and specifications furnished by the State Highway Commission.   Plaintiffs claim that they have not been fully paid and after presenting a verified claim for the additional amount of $14,953.82, and the same having been disallowed, commenced an original action in this court to recover the balance alleged to be due them.   The written proposal of the plaintiffs contained nine items.   The items numbered 14, 23 and 25 are here in controversy.   Plaintiffs have received $304,181.94 for materials designated in these items.   They allege that within the contemplation of the contract they furnished the following quantities of materials for which they have not been paid:

| Item No. | Item | Quantity Furnished | Unit Price | Amount Claimed |
|---|---|---|---|---|
| 14 | Base Course, Crushed Gravel Surfacing in Place | 514.3 tons | $2.24 | $1152.03 |
| 23 | Liq. Bitumen for Mat | 29774 gals. | .16 | 4763.84 |
| 25 | Plant Mixed Mineral Aggregate | 2031 tons | 4.45 | 9037.95 |

The motion of the state to dismiss the complaint on the ground that the court was without jurisdiction to render judgment for damages resulting from breach of contract was denied. Alexander v. State, 74 S.D. 48, 48 N.W.2d 830. The state thereafter filed an answer asserting that it had paid all amounts due under the contract. This court referred the cause to the Hon. O. K. Whitney, Judge of the Sixth Judicial Circuit, for trial and the referee was instructed upon conclusion of the hearing to report his findings of fact and conclusions of law and to submit therewith a transcript of the proceedings before him. The findings and conclusions of the referee are to the effect that the requirements of the contract were exceeded without authorization at least to the extent of the quantity of materials for which plaintiffs now are demanding payment.

Plaintiffs assert that the referee misconstrued the terms of the contract, that it is a unit price contract, and that plaintiffs are entitled to payments on the basis of the unit prices specified therein for all materials furnished under the direction of the engineer and inspectors in charge of the construction. It is admitted that the quantities of materials for which plaintiffs seek recovery were placed on the highway. The cause of action set forth in the complaint is not for the value of extra work which would under the terms of the contract require a written order to enable the plaintiffs to recover and we do not understand that they question the accuracy of the plans and specifications as relating to the quantities of materials. The plans and specifications prepared in advance and upon which plaintiffs based their bid and which became a part of the contract divide the project into seventeen segments and specify for each the quantities of materials required to provide a bituminous mat of a fixed width and "2+" inches in thickness as shown in a cross-section diagram therein. Mr. McCready, who was employed on the project by plaintiffs and who had been employed in highway construction work for 15 years, testified that he was in charge of the finishing machine laying the bituminous material, that the thickness of a mat is regulated by a screed on the machine; that the plant mix is dumped from trucks on an apron at the front of the machine and is conveyed back and

by means of augers is distributed on the highway; that a device known as a "stinger" consisting of an adjustable gauge on a rod was used to measure the depth of the mat; that state inspectors using this device measured the depth; and that he followed their instructions in adjusting the screed. Plaintiffs admitted that they during the construction made no computations upon the basis of tonnage and lineal distance. A member of plaintiff partnership testified that "about the twelfth mile it was discovered that too much material was going on the highway". Expert witnesses for the state testified that adjustment of the screed upon the basis of tonnage and lineal distance is the most accurate method of control and that following such method it is possible to maintain control within about one per cent. The amount of bitumen and plant mix for which plaintiffs ask judgment was sufficient in compliance with the requirements of the plans and specifications to build an additional mile of bituminous highway.

The proposal contained among others the following provisions: "On the basis of the plans, specifications, special provisions and form of contract proposed for use, the undersigned proposes to furnish all necessary machinery, tools, apparatus and other means of construction, to do all the work and furnish all the materials in the manner specified, to finish the entire project within Eighty (80) weather working days, and to accept as full compensation therefor the amount of the summation of the products of the actual quantities, as finally determined, multiplied by the unit prices bid. The undersigned understands that the quantities mentioned below are subject to increase or decrease, and hereby proposes to perform all quantities of work, as increased or decreased, in accordance with the provisions of the specifications, and at the unit prices bid." Plaintiffs on the form furnished by the State Highway Commission inserted the price bid for each item in the column· headed "Unit bid price" and also the total amount bid on each item in the column "Amount bid". The proposal further states that "The undersigned understands that the 'Total or Gross Sum Bid' as immediately herinbefore set forth is not the final sum which will be paid if this proposal is accepted

and the work done, but that such sum is computed for the purpose of comparison of the bids submitted and the determination of the amount of the contract bond".

The pertinent provisions of the contract read: "The said Contractor has agreed and by these presents does agree * * * to furnish all the materials, * * * and labor of every kind and to construct in the most substantial and workmanlike manner and in accordance with the plans and specifications therefor, the various items of work awarded the said contractor. * * * The said work shall be performed in accordance with the true intent and meaning of the plans and specifications therefor, including the special provisions, which plans and specifications, including the special provisions, are hereby referred to and made an essential part of this contract as fully and to the same effect as if the same had been set forth and shown at length in the body of this contract. * * * In consideration of the faithful performance of the work embraced under this contract, according to the terms hereof and to the satisfaction of the party of the first part, said party of the first part agrees to pay the contractor, such unit or lump sum prices for the work actually done as are set forth in the proposal accompanying this contract, and and in the manner and subject to the conditions as set forth in the said specifications."

The specifications deal with the reserved right in the state to increase or decrease the quantities shown in the plans or proposal or to omit any of them as it deems necessary and authorize payments on the basis of actual quantity furnished whenever the quantity of any item has been increased or decreased. They also contain provisions regarding control and supervision of the work. Some of these provisions are as follows: "An Inspector may be stationed on the construction to report to the Engineer as to the progress of the work, the manner in which it is being performed, to report whenever it appears that the materials furnished and the work performed by the Contractor fail to fulfill the re-quirements of the specifications and contract, and to call to the attention of the Contractor any such failure or other infringement. Such inspection, however, shall not relieve the Contractor of any obligation to perform all of the work

strictly in accordance with the requirements of the specifications. In case of any dispute arising between the Contractor and the Inspector as to materials furnished, or the manner of performing the work, the Inspector shall have the authority to reject materials or suspend work until the question at issue can be referred to and decided by the Engineer. Work performed by the Contractor, after written order by the Inspector to suspend operations, will not be accepted, or paid for, by the Commission. The Inspector is not authorized to revoke, alter, enlarge, or release any requirements of these specifications, nor to approve or accept any portion of the work, nor to issue instructions contrary to the plans and specifications. The Inspector shall in no case act as foreman or perform other duties for the Contractor, nor interfere with the management of the work by the latter. Any advice which the Inspector may give the Contractor shall in nowise be construed as binding the Engineer or the Commission in any way, nor releasing the Contractor from fulfillment of the terms of the contract." The specifications under the heading "Measurement and Payment" provide: "After the work is completed and before final payment is made therefor, the Engineer will make final measurements to determine the quantities of various items of work performed as the basis for final settlement. The Contractor in all cases will be paid for the actual amount of work performed in accordance with these specifications as shown by the final measurements, with waste deductions made for any and all unauthorized work."

The theory of the plaintiffs can be best stated in the language of their learned counsel: "The proposal and contract each recite that this is not a fixed sum contract, but is a unit price contract; that it is understood that the quantities are not final but subpect to increase or decrease, and that settlement will be made on the basis of the actual quantities furnished. The plans require the construction of a pavement of fixed width and not less than 2 inches in thickness, with the variation, if any, to be plus, i. e., in excess of 2 inches. The plans show the mat to be installed 2 inches plus. It is true that the plans contain an estimated yield, or estimated quantity required per mile to produce

the specified pavement, but nowhere do the plans or specifications limit the quantity to the estimated yield or require the contractor to build the road for a fixed sum. Nowhere, it appears, does the contractor guarantee the yield. He agrees to build the road under the detailed directions and instruction of the State for a consideration based upon the quantity of units furnished."

■ If the materials in question were not required in the performance of the contract and outside of its terms plaintiffs cannot recover as materials furnished by direction of state agents although they may have been employed to superintend the execution of the contract. See Kansas City Bridge Co. v. State, 61 S. D. 580, 250 N.W. 343; Griffis v. State, 69 S. D. 439, 11 N.W.2d 138. If the agents of the state made demands not justified by the contract plaintiffs had the right to refuse to comply, but plaintiffs cannot recover if authority was not exercised in accordance with its terms. The authority of the State Highway Engineer and his subordinates to bind the state must be found in the contract.

■ ■ As we understand the contention of counsel for plaintiffs, it is that the quantities recited in the specifications are simply estimates and subject to increase or decrease without written authorization and that settlement must be made on the basis of quantities of materials actually furnished at the agreed unit prices. This position is not sustained by cases like Dance v. Board of Education, 296 Ky. 67, 176 S.W.2d 90, 92, cited by plaintiffs, wherein there was recovery for additional quantities of material supplied by the contractor without written order from the architect. That case was one where the work was not independent of the contract but was caused by miscalculation of the architect in specifying the number of bricks required for the improvement and necessary to its completion. In so holding, the court recognized a distinction between "extra work" and "additional work". The court said: "It can hardly be said that this additional brickwork was 'extra work' within the meaning of the contract requiring a signed order by the architect. Rather we would say that this was 'additional work' without which the contract could not be performed.

'Extra work' for which an order must be issued by the architect before the contractor can recover for it, as used in the contract before us, refers to work arising out of but entirely independent of the contract, which was not required in its performance. But the 'additional work' for which we are allowing the contractors to recover is work that is necessarily required in the performance of the contract and without which it could not be carried out." As we have previously stated there is in the instant case no claim of error or miscalculation by the engineers in the preparation of plans and specifications. They made allowance for compaction in computing the amount of materials required in order to construct a bituminous mat of a fixed width and "2+" inches in thickness and it is conceded that the quantities recited in the specifications were sufficient to have constructed a bituminous mat of the required dimensions. The contract contemplated that plaintiffs would supply materials within the scope of the specifications and we cannot accept the view that because payments were to be made upon the basis of unit prices the quantities of materials to be supplied were subject to increase or decrease without written authorization. It is our conclusion that as to quantities of materials there was not a substantial compliance with the specifications and that the referee was clearly right in holding that the increased materials for which plaintiffs demand payment were beyond the requirements of the contract. The plaintiffs having furnished more materials than was required by the contract without having procured the necessary authorization, the state is not bound. Parties to a written contract are presumed to understand the import of its terms and to have entered into the contract with knowledge of their respective rights and obligations.

Judgment for defendant.

RUDOLPH and SMITH, JJ., concur.

SICKEL and LEEDOM, JJ. (dissenting). This is a contract for a two inch plus mat of bituminous surface on a given strip of highway. The Highway Engineer estimated the quantities of materials needed to complete the job, and these estimates were incorporated in the contract. The ma-

terials used in performance of the contract exceeded the amount of the Engineer's estimates, and the Highway Commission has rejected the claim of the Contractor for the excess. There is no dispute as to the amount of the excess units of materials used, nor as to the unit price of materials as fixed by the contract.

Claimant contends that the agreement is a unit price contract, and that the Highway Commission is obliged to pay for all excess materials used in the performance of the contract.

The contract provides: 'The undersigned understands that the quantities mentioned below are subject to increase or decrease, and hereby proposes to perform all quantities of work, as increased or decreased, in accordance with the provisions of the specifications, and at the unit prices bid."

The State agreed to pay for "faithful performance" according to the terms of the contract, and to the satisfaction of the State "such unit or lump sum prices for the work actually done as are set forth in the proposal accompanying this contract, and in the manner and subject to the conditions as set forth in the said specifications".

The specifications provide: "The bidder's attention is called to the fact that the estimates of quantities of work to be done and materials to be furnished under these specifications, as shown on the plans or accompanying the proposal, is approximate and is given only as a basis of calculation for comparing bids and awarding the contract. The State does not assume any responsibility that the quantities given shall obtain in the construction, and reserves the right to increase or diminish the quantities shown, or to omit any of them, as it deems necessary." Spec. 2.2.

The estimates of quantities of materials are not specifications of exactness, nor are they limitations upon the State's liability. The agreement of the State is to pay the unit price for all materials used in the performance of the contract.

The State contends: "* * * That the quantities of materials specified in the plans and proposal are final except for the power of the State to make changes by the method

set forth in the specifications." Also: "Under the contract, it was the responsibility of the contractor to see to it that no excess material went into this highway unless he had written authority to apply such excess material".

"What we have is a contract to do a defined quantity of work according to certain specifications with a unit price payment feature. A fair reading of the specifications cannot produce any different conclusion but that the unit price payment feature was inserted in the contract for the sole benefit of the State in order that the State Highway Engineer might increase or decrease the work to be done and having done so, have a readily ascertainable basis for recomputing payments to be made under the contract."

This interpretation of the contract confuses "extra work" which relates to materials furnished and work done in addition to the requirements of the contract and for which a change order is required, and excess materials used in the performance of the contract according to plans and specifications.

The distinction is recognized in Section 4.4 of the specifications in the following language:

"The Contractor shall perform such work in addition to the quantities shown on the approximate estimates as may be deemed necessary by the Engineer to complete fully the project contemplated. The project limits may also be changed as deemed necessary. .

"* * * If the sum total of the increase or decrease on all items figured at the unit contract prices is not more than twenty-five (25) per cent of the total original contract the Contractor shall receive and accept payment in full on the basis of the contract unit prices."

In this case the claim is for quantities or units used in the performance of the contract, in addition to the quantities shown on the estimates of the Engineer, and the claim is allowable under the specifications referred to above.

The Highway Commission contends that because the units of materials used in the project exceeded the estimates of the Engineer, the compacted mat laid upon the highway exceeded the specified thickness of 2 inches plus.

The materials were necessarily deposited on the highway and the thickness measured at a depth sufficient to allow for compaction. The witnesses estimated that compaction would amount to ⅜th to ½ inch. It was necessary to set the spreader by probing and testing the depth of the spread with an instrument called a stinger, operated by the Highway Commission's Engineers and Inspectors. The evidence fails to show the amount of compaction allowed by the Engineer in arriving at his estimates. Neither does the evidence show the amount allowed for compaction by the Engineers and Inspectors in measuring the depth of the spread. There is no evidence to show the thickness of the mat after compaction, and it cannot now be measured with the stinger because of solidity. The evidence does not show any attempt to measure it since compaction.

The evidence upon which the State relies to prove the use of excess materials is the Engineer's estimates of materials as contained in the contract. Those estimates of quantities are only approximate, given only "* * * as a basis of calculation for comparing bids and awarding the contract". "They were not intended to obtain in the construction". Spec. 2.2. The Contractor was obliged to perform the work in applying such additional quantities "as may be deemed necessary by the Engineer to complete fully the project contemplated". If the materials consumed exceed the estimate by less than 25% of the estimates: "* * * The Contractor shall receive and accept payment in full on the basis of the contract unit prices". Estimates of quantities of materials under this contract have no probative value whatever as to the quantities required to complete the contract.

The above conclusions are consistent with prior decisions of this court. The case of England v. State, 61 S. D. 132, 246 N.W. 628, was an action on quantum meruit for work not authorized by the contract, and the contract had never been modified. The Contractor could not recover. In the Kansas City case it was held that extra work is that which is not required to be performed by the contract, and that the Engineer could not waive the provisions of the contract as to extra work. In the Griffis case the claim was for

extra work and it was held that a written order for such work is required; that the Engineer and the Inspector could not vary the contract. None of these three cases relate to materials in excess of estimates needed to perform the contract according to its terms.

The Highway Commission also contends that: "* * * The facts proved show that the officers and employees of the State Highway Department did not even attempt to exercise a direct positive control over plaintiffs in their performance of the contract. * * * Under the contract, it was the responsibility of the contractor to see to it that no excess materials went into this highway. * * *".

The contract provides that the work shall be done under the direct supervision of the Highway Engineer and to the complete satisfaction of the State Highway Commission. Spec. 5.8.

As to the authority of the Inspectors the specifications, 5.7, provide:

"Authority and Duties of Inspectors. Inspectors employed by the Commission shall be authorized to inspect all work done and all materials furnished. Such inspection may extend to all or any part of the work and to preparation, fabrication, or manufacture of the materials to be used.

"An Inspector may be stationed on the construction to report to the Engineer as to the progress of the work, the manner in which it is being performed, to report whenever it appears that the materials furnished and the work performed by the Contractor fail to fulfill the requirements of the specifications and contract, and to call to the attention of the Contractor any such failure or other infringement. Such inspection, however, shall not relieve the Contractor of any obligation to perform all of the work strictly in accordance with the requirements and specifications.

"In case of any dispute arising between the Contractor and the Inspector as to materials furnished, or the manner of performing the work, the Inspector shall have the authority to reject materials or suspend work until the question at issue can be referred to and decided by the Engineer. Work performed by the Contractor, after written order by

the Inspector to suspend operations, will not be accepted, or paid for, by the Commission. The Inspector is not authorized to revoke, alter, enlarge, or release any requirements of these specifications, nor to approve or accept any portion of the work, nor to issue instructions contrary to the plans and specifications. * * *"

Harvard C. Rempfer, the State Highway Engineer, testified that the only method of obtaining exact control is measurements of area and quantity over areas that have been spread and compacted. He testified that Mel Harris was the Project Engineer. Sanders was the Highway Commission's representative on the job to carry out the Commission's instructions and the regulations and specifications. The witness testified that excess materials might not be wrong. He also testified that the road was accepted by the Highway Commission. The spreading machine was accepted as standard equipment, one universally used.

Summerside was Assistant Construction Engineer for the Highway Department. He testified that the only effective method of control over materials was the checking of quantities spread on a given area.

Lovejoy, Bituminous Engineer, testified that he did not know that materials in excess of estimates were going in until the final estimate had been prepared.

Harris, the Project Engineer, testified that he had charge and control of the operations, usability of materials, interpretation of the specifications and plans; that he visited the job 25 times, and **attempted through the Inspectors to control the job,** not to take over. He did not know that excess tonnage was going in during the course of construction. At no time during the progress of the work did Chief Inspector Sanders tell him they were not getting the yield. "If Sanders knew it he did not tell me."

Sanders, a Commission representative, testified that he knew they were running long on the job, but that he gave no orders to the Contractors' men but told them about it.

McCready, Superintendent for the Contractors, tested depth and Sanders watched and assisted him to see if it (the stinger) was sinking in too far or not far enough.

Either Sanders or one of the Commission's men stayed with the machine constantly when operating, and the Contractor was not allowed to dump a load in the machine "if our man was not there." "I never gave orders in the strict sense, but I made suggestions and I found McCready cooperative in following my suggestions."

Youell, Highway Commission Inspector, testified that he worked as Inspector 10% of the time of the job and checked quantities of material; took the number of tons used in a given distance twice early on the job, and once or twice afterwards; that the first test showed that the excess tonnage being used was very slight and he gave no orders to the Contractors' men; talked it over with McCready.

The Highway Commission contends that the estimates were sufficient to lay the mat according to specifications, and on this premise contends that the mat must have exceeded the specifications in thickness. The contention that the thickness of the mat exceeded the specifications is not supported by any evidence whatever. It should be noted that after measuring the quantities according to area on the road at least three times during the progress of the work the Inspectors found no error in the thickness of the mat and made no change in the setting of the instrument used in making the measurement of thickness. The Commission and its employees had no knowledge of the use of materials in excess of estimates until computations were made between the estimates and the quantities used, after the job was finished. The only reasonable conclusion one can draw from these facts is that the estimates of work and materials contained in the contract were treated as estimates only, and that the estimates were not regarded by the Highway Commission as a limitation on the liability of the State under the contract.

The contract, including the specifications, clearly establishes the control of the job by the Highway Commission through its Engineers and Inspectors, and the record shows the exercise of that power. The authority of the Engineers and Inspectors to suspend operations in case of disagreement, and the power of the Engineer to settle disputes is decisive on this question.

If the Highway Commission is correct in its contention that the estimated quantities of materials are final, subject only to a change order, then the contract is not a unit price contract, but a fixed price contract. If it is a fixed price contract then, with the Highway Inspectors and Engineers in complete and absolute control of the spreading as in this case, performance of the contract was complete when the Contractor had spread the estimated quantities of materials upon the highway. Such interpretation of the contract is not justified. By the terms of the contract the estimates were not final but approximate given only as a basis for calculating and comparing bids, and awarding the contract. They were subject to increase or decrease as deemed necessary by the Engineer, and the contract imposed upon the Contractor the duty to spread additional materials at the unit price when this was found by the Engineers to be necessary to fully complete the project. No extra work order was contemplated unless the contract limits were changed by order of the Engineer and there was no such order. These are the distinguishing features of a unit price contract.

For the reasons above stated it is our opinion that the claim of the Contractor should be allowed and paid.