**SWEETMAN CONSTRUCTION COMPANY, INC., A South Dakota Corporation, Plaintiff and Respondent,**

and

**Western Engineering, Inc., Intervening Plaintiff and Respondent,**

v.

**STATE of South Dakota, Herb Teske, As Secretary of the Department of Transportation; Robert Osborn, Manley Feinstein, Thomas Schlacter, Donald Garry, and Gerry G. Schoener, as members of the Board of Transportation, Defendants and Appellants.**

No. 12741.

Supreme Court of South Dakota.

Argued March 14, 1980.

Decided June 18, 1980.

Lee M. McCahren, Vermillion, for plaintiffs and respondents.

Carl W. Quist, Asst. Atty. Gen., Pierre, for defendants and appellants; Mark V. Meierhenry, Atty. Gen., Pierre, on the brief.

FOSHEIM, Justice.

This action arises from a public improvement contract for a highway project let by public bid by the South Dakota Department of Transportation. From a judgment entered in favor of plaintiffs Sweetman Construction Company (Sweetman) and Western Engineering, Inc. (Western), the Department appeals. We affirm.

Plaintiff Sweetman contracted with the State for construction of a portion of Interstate 90 near Chamberlain, South Dakota, in early 1972. Sweetman subcontracted with plaintiff Western for asphalt work, which constituted approximately 31% of the entire project. The State made no contract with Western. However, in a letter of approval, the State consented to the subletting. That approval was required to assure compliance with specifications that prohibited subcontracting more than 50% of the work. Section 9.11 of the "Special Provision for General Requirements" (incorporated in the prime contract) allowed compensation for freight rate increases or decreases "provided the materials are shipped from the nearest available source of satisfactory material."

The oil (asphalt) used by Western for the project was transported by truck from Laurel, Montana, and the necessary aggregate material was shipped by rail from Hudson, South Dakota. At the time of bid-letting, the freight rate for asphalt was $20.40 per ton by truck. 5943.53 tons of asphalt were hauled, which at that rate amounts to $121,249.23. The freight rate for rail shipment of aggregate at the time the bids were let was $1.84 per ton. 38,673 tons were shipped by rail, which at the original rate, amounts to $71,158.22. At such rates, Western would have incurred expenses in the total amount of $192,407.45.

The OPEC oil embargo struck after the 1972 bid-letting and freight rates increased dramatically during the construction project. It is uncontroverted that due to rate increases allowed by the Interstate Commerce Commission and South Dakota Public Utilities Commission, Western actually paid $256,745.87, resulting in increased freight rates of $64,338.42. Invoices and receipts were submitted, but the Department of Transportation refused to reimburse plaintiffs for the increase, contending that the closest available sources of oil and aggregate were Sioux Falls and Spencer, South Dakota, and that compensation (if any) for freight increases must be determined on the basis of increased rates from those locations.

Western was allowed to intervene as a plaintiff in this action brought by Sweetman. Following a trial to the court, judgment for $64,338.42, plus interest, was entered in favor of plaintiffs. From that judgment, the State appeals, raising several issues for our consideration.

The State first contends that Sweetman has no contractual claim against it for the freight rate increases. The specifications incorporated in the contract between Sweetman and the State provided that the bid prices for items of work involving materials "are assumed to be based on common carrier rates in effect on the date of opening bids." Section 9.11(2) of the special provision stated an exception:

If, between the date of bid opening and the date on which the designated materials are shipped to the project, the freight rates are increased, causing an additional

cost to the Contractor, the State will reimburse the Contractor in the exact amount of cost caused by such increase provided the claim is supported by proper certification originating with the common carrier.

Section 9.11(9), however, provided:

Compensation for increased freight rates will be limited (1) to materials shipped direct to or *in care of the Contractor* and on which he pays the freight separately and apart from the purchase of the materials, and (2) to the *materials which he purchases F.O.B. delivery site for the project*, with a clause in the purchase agreement whereby the purchase price of the material will be adjusted on the account of a change in freight rates, *provided the materials are shipped from the nearest available source* of available materials. If the materials are not shipped from the nearest available source of satisfactory materials, compensation will be on the basis of the calculated increase in freight from the nearest available source of satisfactory materials. [emphasis supplied]

Had the materials been purchased by or shipped to Sweetman, it is clear that Sweetman would have a claim against the State for the freight rate increases. The fact that the materials were purchased by and shipped to Western, however, does not negate the existence of a legitimate claim for the rate increases by Sweetman against the State. Paragraph 6 of the subcontract provided:

CONTRACTOR shall not be liable for extras, unless allowed and paid for by the OWNER; and CONTRACTOR may assign to SUB–CONTRACTOR the right to recover for extras on claims from the OWNER [.]

The term "extras," as used in connection with construction contracts, means work or costs arising outside of and entirely independent of the contract; that is, something not required in its performance, not contemplated by the parties, and not controlled by the contract. *Alexander v. State*, 74 S.D. 593, 57 N.W.2d 121 (1953); *Kansas City Bridge Co. v. State*, 61 S.D. 580, 250 N.W. 343 (1933); *C. F. Bolster Co. v. J. C. Boespflug Construction Co.*, 167 Cal.App.2d 143, 334 P.2d 247 (1959). We need not determine whether the rate increases here would properly be denominated "extras." Payment of increased freight rates in the present case was unavoidably required to expeditiously complete the project; the possibility of such increases was clearly contemplated by the parties to the prime contract and was expressly controlled by Sections 9.11(2) and 9.11(9) therein. It is further apparent that it was contemplated between Sweetman and the State that these provisions would apply to work sublet. Section 8.1 of the Standard Specifications, made a part of the prime contract, provided that " . . . the Contractor shall give his assurance that *all pertinent provisions of the prime contract . . . shall apply to all work sublet . . .* " [emphasis supplied]. It hardly requires saying that Sections 9.11(2) and 9.11(9), which provide for the payment of freight rate increases, are "pertinent provisions of the prime contract." In addition, Leonard Peterson, Construction Engineer for the Highway Department, testified that Western was, in fact, considered a subcontractor, not a mere supplier or materialman. Mr. Peterson further conceded that it is generally envisioned by the State that significant portions of such highway construction projects will be sublet, and there is no evidence of any contrary expectation in the present case. The corporate presidents of both Sweetman and Western testified that subcontractors' cost increases previously had been passed on to the State by prime contractors under very similar contracts and that such claims had never before been denied by the State. We believe that this contract must be viewed in terms of such custom and usage, *Hardware Specialties, Inc. v. Mishara Const. Co., Inc.*, 2 Mass.App. 277, 311 N.E.2d 564 (1974), *Baccari v. B. Perini & Sons*, 293 Mass. 297, 199 N.E. 912 (1936), and accordingly hold that Sweetman does have a claim against the State for the freight rate increases. To find that Section 8.1 of the prime contract operated to extend Sweet-

man's responsibilities with respect to work sublet, and yet find no corresponding extension of the State's obligation with regard to costs reasonably to be anticipated, would be manifestly unreasonable in view of the evidence.

■ The State next contends that there is no privity of contract between Western and the State and that Western thus has no standing to sue the State. The State relies upon SDCL 31–2–34, which provides, in pertinent part:

The state of South Dakota may be sued and made defendant in any court in which an action is brought against the South Dakota department of transportation respecting *any claim, right, or controversy arising out of the work performed*, or by virtue of the provisions of any construction contract entered into by the South Dakota department of transportation. [emphasis supplied]

The emphasized language of this statute is clearly broad enough to authorize Western's claim here. We need not consider whether this statute requires *all* claimants to be in privity of contract with the State. It suffices to say that Western, pursuant to a subcontract expressly approved by the State, has standing under SDCL 31–2–34 to bring its claim against the State for work performed.

■ The State further contends that Sweetman and Western cannot modify the subcontract by parol evidence to create an obligation of the State to Western for the rate increases. The common law parol evidence rule is codified in South Dakota in SDCL 53–8–5:

The execution of contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument.

The State argues that the trial court erred in considering evidence of an oral agreement between Sweetman and Western that any freight rate increases resulting from the anticipated OPEC oil embargo would be paid to Western by Sweetman.

In *De Pue v. McIntosh*, 26 S.D. 42, 127 N.W. 532 (1910), we stated that where a contemporaneous parol agreement was the inducing and moving cause of the written contract and where the contract was executed upon the faith of the parol agreement, such evidence is admissible. In *Farmers' Elevator Co. v. Swier*, 50 S.D. 436, 210 N.W. 671 (1926), we commented on the language from *De Pue v. McIntosh* upon which plaintiffs rely and said: "This rule, however, in the absence of fraud or mistake, should not be and by this court never has been extended to cases in which the written contract is complete and unambiguous and the consideration contractual in nature." 50 S.D. at 443, 210 N.W. at 673. In the present case, the subcontract made no provision whatsoever for freight rates. Thus, while there is no allegation of fraud or mistake with respect to the subcontract, the instrument is nonetheless ambiguous concerning an essential term of the contractual undertaking. Evidence of the parol agreement, which was obviously an inducing and moving cause of the written contract, was necessary to clarify an ambiguous part of the contract. The subcontract apparently was executed upon the faith of the parol agreement and the trial court, in our opinion, properly considered evidence of that agreement.

■ Having concluded that plaintiffs have legitimate claims against the State for the freight rate increases, we must determine whether the trial court erred in finding that Laurel, Montana, and Hudson, South Dakota, were the nearest available sources of asphalt and aggregate. The State, as noted earlier, contends that the nearest available sources for the materials were Sioux Falls and Spencer, South Dakota, and that the rate increases must be calculated on the basis of increase from those locations.

The Spencer, South Dakota, source for aggregate was a quarry owned in part by Sweetman. Richard Sweetman, President of the Sweetman firm, testified that Western was able to procure aggregate from the Hudson source at a cheaper rate than that

available at Spencer. Grant Finley, Western's president, testified that not only were the preparation costs higher at Spencer, but there was no assurance that the Spencer quarry would have enough of the product available ahead of time. No evidence contradicts that testimony. With respect to the asphalt supply, Messrs. Sweetman and Finley both stated that their respective businesses experienced much difficulty with oil suppliers during the period in question. Sweetman had a contract for one million gallons of oil with a supplier in Sioux Falls, but was informed by its dealer that there would be considerable delay in meeting that obligation. Western investigated various oil supplies at the time of bid-letting, including those in Sioux Falls, and finally resigned itself to the Montana source. Robert Victor, the State's final estimate engineer, admitted that he had no knowledge of the availability of oil in Sioux Falls and had not checked with any Sioux Falls suppliers about such availability. While Sioux Falls and Spencer may have been the nearest sources, it appears that they were not the nearest *available* sources. The evidence indicates that plaintiffs, faced with supply problems caused in part by the unique circumstances stemming from the OPEC embargo, successfully sought to finish the project in the most responsible and least expensive fashion. Accordingly, we cannot say that the trial court's finding that Laurel, Montana and Hudson, South Dakota, were the nearest available sources of essential materials was clearly erroneous. *Cun-*

*ningham v. Yankton Clinic, P.A.,* 262 N.W.2d 508 (S.D.1978).

■ The State finally contends that the trial court improperly granted interest on the judgment awarded plaintiffs, because SDCL 31–2–38 and 39 refer only to damages and costs and do not specifically mention interest.[1] Those statutes, however, simply deal with the manner in which judgments against the Highway Department are to be satisfied. SDCL 21–1–11 provides that interest is allowable as an item of damages when the amount is capable of being made certain and vested on a particular day.[2] The court's judgment included interest on the sum due for the increased freight rates. The amount due was capable of determination as of July 30, 1974. Interest was allowable thereafter.

The judgment is affirmed.

DUNN, MORGAN and HENDERSON, JJ., concur.

WOLLMAN, C. J., concurs in part, dissents in part.

WOLLMAN, Chief Justice (concurring in part, dissenting in part).

The terms of the principal contract between the State and Sweetman bar Western from recovering for the additional freight charges. Likewise, nothing in the subcontract between Sweetman and Western gives Western any claim against the State for those charges.

1. SDCL 31–2–38 provides:
   The state of South Dakota shall pay to any successful litigant, the amount of damages awarded and the amount of costs assessed against the state of South Dakota, out of the state highway fund from all the moneys levied and collected by the state by general state taxation for state highway purposes, or appropriated for state highway purposes.
   SDCL 31–2–39 provides:
   No execution shall issue against the state on any final judgment obtained under the provisions of this chapter; but whenever final judgment against the state shall have been obtained in any such action as herein provided, the clerk of the court wherein the final judgment was obtained, shall forthwith,

send a certified copy of said judgment by registered mail to the director of highways, and to the state auditor, and the auditor shall there upon audit the amount of damages and costs therein finally awarded, and the same shall be paid out of the state highway fund by the state treasurer.

2. SDCL 21–1–11 provides:
   Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor, from paying the debt.

The subcontract was entered into on March 13, 1972. It consisted of a one-page printed form, to which some eight typed provisions were added, together with a detailed listing of the materials that were to be furnished in place by Western and the amounts to be paid therefor. Notwithstanding the fact that the subcontract very carefully spells out the provisions that the parties found necessary to add to the printed form, we are told that some two months earlier the president of Sweetman and the president of Western reached an "additional understanding" that concerned "the possibility of freight rate increases." It strains credulity to believe that two experienced contractors would enter into a detailed written subcontract some two months later on the strength of this alleged oral agreement and yet not see fit to make even a passing reference to increased freight rates in the written contract. Significantly, although the president of Western testified in great detail concerning the problems Western had in securing an adequate supply of oil during the construction of the project, he was not asked nor did he testify concerning this alleged precontract oral understanding. Given the circumstances, I would hold that the subcontract is not ambiguous concerning an essential term of the contractual undertaking.

Although I would hold that there is no obligation on the part of the State to pay additional amounts for the increased freight rates, I agree with the majority opinion regarding the obligation of the State to pay interest on any amounts that are found due and owing in contracts of this nature.