[Civ. No. 1365.   Third Appellate District.—May 26, 1915.]

RUSSELL LOWRY, Appellant, v. HERBERT E. LAW,
Respondent.

BUILDING CONTRACT—ASSIGNMENT—WHEN ACCOUNT NOT STATED.—An
account stated is not established as between the owner of a build-
ing and a bank to whom the contract for the construction of the
building had been assigned as security for moneys advanced to
enable the contractor to complete the building, as to the final pay-
ment of twenty-five per cent due under the contract without regard
to the claims that might be made upon it by materialmen, sub-con-
tractors or laborers, by the statement of the authorized agent of the
owner to the vice-president of the bank that such reserved payment
would not be made to the contractor, but would be held until thirty-
five days after the completion and acceptance of the building, as
the building contract expressly provided, and which also provided
that the payment should not be made until satisfactory proof had
been made that the building was free from liens.

ID.—ACCOUNT STATED—WHAT CONSTITUTES.—To constitute an account
stated there must be an agreement, express or implied, between
the parties as to the correctness of the items of the account and
that the balance struck is correct, together with a promise, express
or implied, for the payment of such balance.

ID.—COUNTERCLAIM—OMITTED WORK.—In an action by the bank against
the owner to recover such final payment without regard to the claims
of lienors, a counterclaim based upon omitted work may be set up
as an offset to a claim for extra work.

APPEAL from an order of the Superior Court of the City
and County of San Francisco denying a new trial.   Franklin
J. Cole, Judge presiding.

The facts are stated in the opinion of the court.

Gavin McNab, and R. P. Henshall, for Appellant.

Edgar C. Chapman, for Respondent.

CHIPMAN, P. J.—Plaintiff brought the action as assignee
of the American National Bank of San Francisco, hereinafter
referred to as the bank, and as assignee of the American-
Hawaiian Engineering & Construction Company, hereinafter
referred to as the construction company.   There were several
causes of action stated.

In the first count is alleged an account stated, in the sum of $46,033.50, between the bank and defendant which was assigned to plaintiff.

The second count is for the value of certain extras furnished in the construction of the Monadnock Building in the city of San Francisco, aggregating $2,892.19.

The third count is for additional extras based upon their reasonable value, to wit: the sum of $5,225.53.

The fourth count is for the sum of $3,597.50 as a balance due upon an open account for moneys paid and expended for the use and benefit of defendant.

The causes of action set out in the second, third, and fourth counts were assigned to plaintiff by the construction company.

In his answer the defendant denied the existence of any account stated; admitted the doing of certain extra work but denied that it was of greater value than $939.99, exclusive of the set-off and counterclaim set forth in the answer. The answer to the third count is a denial, but admits certain amounts to be due which it is alleged, however, were offset by the counterclaim; the fourth count was denied.

As a special defense to the several causes of action alleged in the complaint and by way of counterclaim, defendant alleged the existence of a bulding contract between the construction company, plaintiff's assignor, and the defendant, in which the price for the erection of said building was fixed at the sum of $482,200.00 to be paid by defendant, the owner, to the said contractor in installments, subject, however, to additions and deductions on account of alterations and omissions, respectively; that by agreement a large amount of work was omitted from the construction of the building, and that the total reasonable value of the amount of work so omitted was $12,657.10, which defendant claimed as a set-off by deduction from the conceded claims and demands of plaintiff.

The cause was tried by the court without a jury and upon the issues thus raised the court found: That there was no account stated; that the value of the extra work referred to in the second cause of action amounted to the sum of $200.00 and no more, in addition to the sum of $1,147.12 admitted to be due by the answer, subject, however, to the set-off and counterclaim of defendant, amounting, as elsewhere found, to $10,055.64; as to the third cause of action the court found that the value of the extra work amounted to $787.96, which

was subject to said counterclaim. The total value of the extra work included in the second and third counts, admitted and found, was $2,356.99; as to the fourth cause of action the court found that, except as stated in the findings, it was not true that there was a balance due upon an open book account for moneys paid out and expended by said construction company the sum of $3,572.50, as alleged, but that of said sum there had been paid out and expended the sum of $672.50 and no more. The court further found the amount of the off-set as heretofore stated, to wit: $10,055.64.

As conclusion of law the court found that plaintiff was not entitled to any judgment and that defendant was entitled to his costs and judgment was entered accordingly. Plaintiff's motion for a new trial was denied and he appeals from the order.

Plaintiff contends 1. That the evidence established an account stated; 2. That the value of the extra work, fixed at $2,359.99, should be increased by the sum of $3,225.00, being the alleged value of certain extra work in constructing certain pilasters of the reasonable value of said last named amount; and, 3. That there is no evidence to sustain the finding that the reasonable value of the omitted work, claimed in defendant's offset, was $10,055.64.

The alleged account stated first demands attention. To establish plaintiff's contention, he was called upon to show by clear proof that an agreement existed between the bank and defendant that the twenty-five per cent of the contract price should be and was held by defendant for a period of 35 days after the completion of the contract, for the sole use and benefit of the bank and not to meet the claims of possible lienors which, as it turned out, aggregated about $78,000.00. These claims were settled by defendant, as the law and the building contract required, so far as the retained twenty-five per cent, to wit: $46,033.50, would go.

On January 16, 1905, defendant entered into a contract with the construction company by which it agreed to construct a portion of the building known as the Monadnock, in San Francisco. The contract provided that the building should be constructed in two sections, the first one to be completed before the second was commenced. Section 1 was completed in March, 1907, and the money paid to the contractor and its creditors. The present controversy connects itself with the

construction of section 2 on which work began about May 1, 1907, and was completed about March 8, 1909. Upon the completion of this section it was found that, exclusive of omitted work and extra work, there was due the contractor, its creditors or assigns, the sum of $46,033.50 which, as we understand the evidence, was the retained twenty-five per cent of the amount due for work on section 2. The contract was duly recorded and no question arises as to defendant's right as well as duty to withhold payment of this twenty-five per cent for 35 days after the completion of the contract. The only question is, Did defendant put himself in such position as required him to pay this money to lienors and also a like amount to the bank, i. e., to pay it twice?

The contract is a very elaborate document and seems to have been drawn to meet every possible contingency likely to arise. Among other things it provided that progressive payments were to be made monthly of amounts approximating seventy-five per cent of the value of the work and materials to be estimated by the architect and approved in writing by the owner, expressly providing that no more than seventy-five per cent of the contract price should be paid at the completion of the building and that twenty-five per cent of the whole contract price should be paid thirty-five days after completion of the contract and acceptance of the work, as to which latter and the amounts due certificates in writing should be given by the architect, countersigned by the owner. It was also provided that monthly estimates of the architect should be subject to correction by him in any subsequent monthly or final estimates, and the monthly estimates, by the terms of the contract, were "presumed to be only approximate." No oversight in superintendence by the architect and no certificates should relieve the contractor from full performance and the architect was authorized to reject defective or deficient work or require it to be done over and no payment was to be made unless the work had been done to the satisfaction of the architect. It was also provided before payment should be made the contractor was required to give the architect and the owner sufficient evidence that the premises were free from all liens and claims chargeable to the contractor and should there be any after all payments were made the contractor should refund to the owner all moneys the latter may have been compelled to pay in discharging any lien on the premises caused by the contractor's

default.    The contractor was required to and did give a bond
of one hundred and twenty thousand five hundred and fifty
dollars.

The bank made large loans of money to the contractor, at
what times and specific amounts does not appear, but they
were no doubt to enable the contractor, at least in part, to per-
form the work undertaken by it and, as security for its loans
it assigned its interest in the contract to the bank.    This
brought the bank into correspondence with the defendant at
different times during the progress of the work, but there is
no evidence that defendant borrowed or received any money
from the bank or that the relation of debtor and creditor was
established between them except, as is now claimed, that such
relation was in effect established as to the retained final pay-
ment on completion of section 2 of the building, to wit:
$46,033.50.    Plaintiff's claim that there was an account stated
is based upon certain memoranda of conversations had and
letters passed between Mr. E. W. Wilson, who was at the time
vice-president of the bank, and defendant and his authorized
agent, Mr. Huntington.    It becomes necessary, in order to de-
termine the merit of plaintiff's contention, to set forth these
matters as given in the record.    On November 26, 1907, Mr.
Wilson wrote to Mr. Law as follows:

"Regarding the American-Hawaiian Engineering & Con-
struction Company's contract for the erection of the Monad-
nock Building, the proceeds of which have been assigned to
us, would say that you are authorized to pay direct to said
company any funds necessary to take care of their pay-roll,
sub-contractors' bills or for material now being put in said
building; it being understood, however, that you are to with-
hold for us the twenty-five per cent (25%) provided for in
said contract."

This was more than a year prior to the completion of section
2 and, so far as appears, there was no answer sent.    As was
the custom of the bank, Mr. Wilson made a memorandum of
a conversation he had with Mr. Law as follows:

"Credit File No. 2038.
"Credit File
"AMERICAN–HAWAIIAN ENGINEERING CO.

"Mr. Herbert Law called in to talk about the above com-
pany's affairs.    He said Mr. Mason is talking about calling
off his men because the bank will not further assist him to

take care of the pay-roll.   Mr. Law tells me he thinks there is from $30,000 to $50,000 which will be due on the contract when they complete the same.   They have tried to hold back at least $40,000.

"He thinks that all the bills for material and labor on the building have been paid, with the exception of one of the Western Expanded Metal Company for $8,000 or $10,000.

"He says he can secure ourselves with reference to pay-rolls if we will make the requirement that the pay-roll will be O. K.'d by Mr. Huntington, his man in charge of the building. He thinks the building will be completed in about 60 days; this will make final payment in a little more than 90 days.

"E. W. W."

No date is given to this memorandum.   On June 24, 1908, Mr. Wilson entered another memorandum reading as follows:

"I had a talk with Mr. Huntington to-day about the American-Hawaiian Company account.   He tells me that they are not paying this company either directly or indirectly, other than actual pay-roll.   He says that there will be no danger of any portion of the retained percentage being turned over to them."

On June 25, 1908, Mr. Wilson wrote Mr. Huntington as follows:

"In order that you may have something on file, this is to confirm our talk of the 24th inst., which was in effect that you were not, and would not, advance to the American-Hawaiian Engineering and Construction Company, either directly or indirectly, any portion of the retained percentages on their contracts which have been heretofore assigned to us."

On June 28, 1908, Mr. Huntington replied as follows:

"Replying to your letter of June 25th.   On March 30th, 1907, we paid the general contractor 75% of the value of the work done at that time by consent of all parties interested. We now have the 25% reserve of the remaining portion of the building, amounting to $46,033.50, which we will hold until thirty-five days after the completion and acceptance of the building.

"I think this covers the 'retained percentages' you refer to in your letter."

Mr. Wilson testified he understood from what had taken place between him and Mr. Law and Mr. Huntington and by virtue of the assignment to the bank, that the bank was "en-

titled to receive 25 per cent of the contract price of section 2 without regard to the balance of sub-contractors, materialmen and laborers.'' The assignment to the bank was made soon after the work commenced and defendant had notice of it. The provisions of the contract and defendant's rights and duties under it, as well as the rights and duties of the construction company, were known to the bank. The 41st section of the contract expressly provided that the final payment of twenty-five per cent of the contract price was to be made ''thirty-five days after the contract is completely finished and acceptance thereof duly declared . . .; and provided further that before such payment is required the contractor shall give the architect and the owner good and sufficient evidence that the premises are free from all liens and claims, chargeable to said contractor, and should there prove to be any such claim after all payments are made, the contractor shall refund to the owner all moneys that the latter may be compelled to pay in discharging any lien on the premises, made obligatory in consequence of the former's default. . . . 43. And the said parties for themselves . . . and assigns, do hereby agree to the full performance of the covenants herein contained.''

Mr. Huntington testified that certain payments had been made to the contractor, ''some seventy-four thousand odd dollars,'' with the consent of its creditors—''some of the money actually went to them,'' and it appeared that eight thousand dollars went to the bank. ''We did not pay any more. We did not pay $46,033 because that was the 25 per cent reserved on account of the lien law for the sub-contractors and materialmen and which was covered by liens of $78,000. These liens were filed in the office of the county recorder before the 35 days after the construction of section 2 had elapsed.'' The witness' attention was called to section 41 of the contract and he testified that no notice had been given by the construction company or by the bank that the premises were free from liens. ''The reason of our not turning over to the American National Bank the amount of money called for in the assignment due from the'' construction company ''to the bank was on account of the liens on the building, $78,000—we settled those and there was nothing left.''

Appellant relies especially upon the memorandum of June 24, 1908, the letter of June 25 to Mr. Huntington and the reply of the latter, June 28. Mr. Wilson's solicitude seems

to have been that no part of the retained percentages should be paid the construction company. Mr. Huntington's reply was that this twenty-five per cent reserve would be held "until thirty-five days after the completion and acceptance of the building." There is nothing in the memorandum or in the letters suggestive of any agreement that this reserve fund was to be paid the bank regardless of claims that might be made upon it by materialmen, subcontractors or laborers. It is true that Mr. Wilson testified that he so understood from what had previously occurred between him and defendant and his agent, Huntington, and we see no reason for doubting that Mr. Wilson did so understand the situation as we have endeavored to present it from the record. If there was any such agreement, why did the bank and defendant think it necessary to delay paying over this twenty-five per cent for 35 days? We cannot bring ourselves to believe that Mr. Wilson had sufficient legal ground for his belief or that defendant ever intended to waive the express provision of the contract so important to his own protection.

It is reasonable to assume that the bank took its assignment with knowledge of and subject to the operation of the lien law and that it carried with it no assurance that the bank could rely upon receiving any part of the retained twenty-five per cent. If the contractor had the power to assign this thirty-five day payment, the statute as well as the contract itself attached the condition that at the end of 35 days no claims of liens should appear and if such claims did appear that they became preferred and were unaffected by the assignment. The law and the contract made it obligatory upon the owner to pay all such legal claims to the extent possible out of the retained twenty-five per cent.

We fail to discover from the evidence all the essential elements of an account stated. In point of fact, defendant had no account of any kind with the bank. He paid the bank some money under the contract, but he received no money from it. To constitute an account stated there must be an agreement, express or implied, between the parties as to the correctness of the items of the account and that the balance struck is correct, together with a promise, express or implied, for the payment of such balance. (1 Am. & Eng. Ency. of Law, p. 437; *Mercantile Trust Co.* v. *Doe,* 26 Cal. App. 246,

[146 Pac. 692].) "An account stated is a contract." (*Kearney* v. *Bell,* 160 Cal. 661, [117 Pac. 925].)

The evidence showed that, exclusive of certain extra work and certain omitted work, defendant was withholding payment of $46,033.50 as the twenty-five per cent required to be retained for 35 days after the completion of the contract. So far as the amount was concerned it may be said to have been "stated" and it may also be said that there was an agreement, express or implied, as to the correctness of the items of the account thus stated and the balance struck. But we think there was evidence from which the court was authorized to find that there was no promise on the part of the defendant, express or implied, to pay such balance to the bank.

Defendant's liability under the assignment was only such as could be enforced by the contractor and defendant was not liable to the contractor for any payments beyond those provided for in the contract. The bank received the proceeds of the contract, except such as were made to meet the pay-rolls, which latter payments were with the consent of the bank. Defendant was not required to pay more than the contract price for the work and this he did in full, and as he was secured by a bond of more than one hundred thousand dollars he had no occasion for asking the bank to advance money to him. If the bank made advances to aid the contractor it did so with full knowledge of the respective rights and duties of the parties to the contract. We are unable to discover any substantial ground for appellant's contention that there was an account stated between the bank and defendant.

As to the counterclaim found by the court, there was evidence that the omitted work was of the reasonable value of $10,055.64. That it could serve as an offset to the claim for extra work found and admitted rests upon precisely the same ground as the extras themselves. Appellant claims that defendant is concluded by the architect's certificates that were issued from time to time; that the architect must necessarily have considered the amount of omitted work in order to certify what seventy-five per cent of the amount of work would be. The same may be said of the extras. But we have seen that these monthly estimates were but approximations and so declared to be by the contract. The evidence on the point is clear. Witness Smith O'Brien, the architect of the building, who issued the certificates, and witness F. J. Amweg, the con-

tractor's manager, testified on the subject. The architect testified as follows: "In making those estimates the question of extra work, or work omitted to be done, was not considered. Those estimates were made absolutely on the contract price of the building. They were approximations. I wanted to be fair to both sides. I was careful not to pay more than 75 per cent on account of the lien law." And Mr. Amweg testified: "Q. You understood when these estimates of the architect were being made from time to time you were not precluded from getting the value of the construction of that building at the final windup? A. No. We were to get (all?) over 25% and the reasonable value for the extra work done by us and to credit the owner with any work omitted." Naturally, at the completion of the building the contractor had a bill for extras and the owner also had a bill for omissions. That the latter were just setoffs to the former seems clear to us.

Touching the claim for extra work in the construction of pilasters, little need be said. The question whether the work done came within the terms of the contract and specifications and was not, properly speaking, extra work was the subject of much testimony, admitted without objection, and is in sharp conflict. The rule is well settled that where there is a substantial conflict the reviewing court will not interfere. This particular work was a matter of controversy between the construction company and the architect representing the owner, the architect contending both before the work was done, and afterwards that it was not extra work. Section 24 of the contract reads as follows:

"Interpretation of Plans and Specifications: Should it appear that the work hereby intended to be done, or any part of the matters relative thereto appear to the contractor not to be sufficiently detailed or explained in the plans, drawings or specifications, he shall apply to the architect for such further drawings or explanations as he may think necessary, and shall comply with the same as part of this contract so far as they may be consistent therewith, and in the event of any doubt or question arising respecting the true meaning of the plans, drawings or specifications, the same shall be referred to the architect, whose decision thereon shall be final and conclusive. All drawings, plans and specifications are and shall remain the property of the owner."

If it be claimed that the work was outside the contract, not provided for by it, section 25 seems to meet the situation, where it is provided: "that for all work not set forth in the plans, drawings and specifications as now presented and which involves an increased or diminished expense, a reasonable and just allowance shall be made therefor by the owner, but no claim for extra work or work not provided for in the contract shall be allowed unless a written order to perform such work shall have been given by the owner before said extra work or work not provided for in the contract has been commenced," etc.

The order is affirmed.

Burnett, J., and Hart, J., concurred.