[Civ. No. 3384.   Fourth Dist.   July 31, 1946.]

JOE M. MEDINA et al., Respondents, v. VAN CAMP SEA FOOD COMPANY, INC. (a Corporation) et al., Appellants.

Charles C. Crouch for Appellants.

Clarence Harden and Henry F. Walker for Respondents.

MARKS, J.—This is an appeal from a judgment against defendants for the reasonable value of the services of plaintiffs in transporting fish and shark livers, belonging to defendants, from the Canal Zone to San Diego.   The recoveries against the various groups of defendants total $5,857.61.

The facts are not in dispute. Plaintiffs were owners of the tuna boat *Queen Mary*. Van Camp Sea Food Company, Inc., Wm. A. Magellan and others were owners of the *Anna M. Mariano* and Sam Crivello were owners of the *Europa*. Guy H. Silva was the owner of the *Emma R. S.* Salvadore Carlos and others were the owners of the *Sao Joao.*

These boats were fishing in waters off Central and South America. On December 8, 1941, they received orders, via radio, from the Commandant of the Fifteenth Naval District, with headquarters in the Canal Zone, to proceed there immediately. The five boats, and others, arrived about December 12, and their commanding officers, who were owners or part owners of their respective boats, went into conference with officers of the United States Navy. The captains of the fishing boats were told that their ships were to be requisitioned immediately by the United States Government. The question of the disposition of the fish then on board came up. The Naval officers seemingly lacking authority to decide the question, consulted the admiral in command of the district, returned to the conference and told the owners of the fishing boats which had been requisitioned that each would receive pay from the United States for fish to the full capacity of each ship, less the fish already caught and on board. It was decided that the fish on board the smaller boats would be loaded onto the larger boats, returned to the United States and sold. This would leave the greater number of boats for use by the Navy and would preserve the fish and shark livers already on board.

The *Queen Mary* had about three tons of tuna on board. The fish and shark livers on defendants' boats were unloaded onto the *Queen Mary's* deck by the crews of the other boats. They were stowed by the *Queen Mary's* crew which separated the fish with nets so the identity of each catch was preserved. The fish were taken by the *Queen Mary* to San Diego where the canneries for which defendants' boats were fishing, demanded and received delivery of the fish, for which they paid the respective defendants.

It was stipulated that after deductions for spoilage, which was normal for trans-shipped fish, the *Queen Mary* delivered to the canneries the following quantities of fish and shark livers: Off the *Anna M.*, 81.562 tons; the *Europa,* 79.865 tons; the *Emma R. S.*, 85.594 tons; and the *Sao Joao,* 45.8595 tons. The respective boat owners were paid an average of about $150 a ton for the fish and an average of about $1.50 a pound for the shark livers.

The evidence shows there was a government refrigeration plant in the Canal Zone but no market for the fish south of San Diego. The expense of the *Queen Mary* in making a round trip between San Diego and the Canal Zone was $12,000. Her capacity was 300 tons, so the expense per ton, if she were fully loaded, was $40. The trial judge allowed $20 per ton for transporting fish and shark livers from the Canal Zone to San Diego. The evidence is undisputed that the commercial rate for similar services was $25 per ton. The four boats belonging to defendants were requisitioned and placed in government service immediately after December 12, 1941, at a daily charter rate slightly less than $40 per day, manned by government crews. The *Queen Mary* was not requisitioned until April 22, 1942. The fish on the boats were not requisitioned and Naval officers of the Eleventh Naval District, with headquarters in San Diego, expressly disclaimed any governmental interest in the fish upon arrival of the *Queen Mary* there. The fish were delivered to the canneries on defendants' demand (or on demand of some of them). Thus defendants reaped a benefit from the services of plaintiffs which benefit was evidently contemplated when the fish were transferred to the *Queen Mary* for delivery and sale in San Diego. Thus defendants have profited from the transaction to the extent of the market value of the fish and shark livers and the plaintiffs have received nothing except the selling price of about three tons of fish caught, prior to the outbreak of war, to credit against the $12,000 cost of the round trip to the fishing grounds. If we read the record correctly the promise of the Naval officers made at the time of the requisition of defendants' boats, to the effect that the government would pay the owners for full cargoes of fish less the value of the fish on board, had not been kept up to the time of the trial.

It is clear there was no express contract made to the effect that defendants would pay plaintiffs for transporting the fish from the Canal Zone to San Diego. Plaintiffs admit this and rely on the doctrine of quasi contracts to support their judgment.

"A contract is either express or implied." (Civ. Code, § 1619.) "An express contract is one, the terms of which are stated in words." (Civ. Code, § 1620.) "An implied contract is one, the existence and terms of which are manifested by conduct." (Civ. Code, § 1621.) An implied contract is one that " 'is inferred from the conduct, situation, or mutual rela-

tions of the parties, and enforced by law on the ground of justice.'" (*Jennings* v. *Bank of California*, 79 Cal. 323 [21 P. 852, 12 Am.St.Rep. 145, 5 L.R.A. 233].) "The making of an agreement may be inferred by proof of conduct as well as by proof of the use of words" (*Dunham-Carrigan & Hayden Co.* v. *Thermoid Rubber Co.*, 84 Cal.App. 669 [258 P. 663].)

As said in *Young* v. *Bruere*, 78 Cal.App. 127 [248 P. 301]:

"Where one performs for another, with the other's knowledge, a useful service of a character usually charged for, and the latter expresses no dissent, or avails himself of the service, a promise to pay the reasonable value of the services is implied. (6 Cal.Jur. 23; *Semi-Tropic etc. Assn.* v. *Johnson*, 163 Cal. 639, 642 [126 P. 488]; *Pixley* v. *Western Pac. R. R. Co.*, 33 Cal. 183 [91 Am.Dec. 623]." (See, also, *Grant* v. *Long*, 33 Cal.App.2d 725 [92 P.2d 940].)

It is undisputed that the Van Camp Sea Food Company, Inc., prior to December 7, 1941, frequently shipped fish via commercial steamships from Punta Arenas, north of the Canal Zone, to its cannery in San Diego and paid $25 per ton for the service; that the same rate applied between the Canal Zone and San Diego.

▮ Defendants argue that the doctrine of quasi contracts cannot apply here for several reasons. These arguments all center around the proposition that there must be a freedom of choice of the parties to be bound by the implied contract. It is argued that the captains of defendants' boats were ordered by Naval officers to load the fish already caught onto the *Queen Mary*; that the officers of the *Queen Mary* were ordered to receive the fish and transport them to San Diego; that both parties were acting under compulsion of superior authority, had no freedom of choice in the matter so that no agreement to pay for the services rendered by plaintiffs can be inferred from these facts.

The following quotations from *Zottman* v. *San Francisco*, 20 Cal. 96 [81 Am.Dec. 96], furnishes the foundation for this argument:

"There must not only be no restrictions imposed by the law upon the party sought to be charged against making in direct terms a similar contract to that which is implied; but the party must also be in a situation where he is entirely free to elect whether he will or will not accept of the work, and where such election will or may influence the conduct of the other party with reference to the work itself. The mere *retention*

*and use* of the benefit resulting from the work—where no such power or freedom of election exists, or where the election cannot influence the conduct of the other party with reference to the work performed, does not constitute such evidence of acceptance that the law will imply therefrom a promise of payment.''

The Supreme Court also held in that case that the Charter of San Francisco prescribed certain necessary formalities as prerequisites to the making of contracts for public improvements which were not complied with thus limiting the power of the city officials to accept and pay for the work in question. The real ground for the holding in that case is found on page 105 in the statement that ''the law never implies an obligation to do that which it forbids the party to agree to do.''

However, should we accept the argument of defendants as sound, as it well may be, that there must be freedom of choice on the part of the parties to be bound by an implied contract, we cannot reverse the judgment because of the factual situation presented.

It seems from the record that the disposition of the fish in the holds of the ships was first brought up by the ships' officers. It is clear that they wanted these fish sent to market although it is also clear that they would have preferred to have transported the fish in their own boats. It is equally clear that this was prohibited by the requisitioning of the boats. There is nothing to show that they could not have protested the trans-shipment of the fish to the *Queen Mary*, had they desired to do so. The fish belonged to them and not the government and the *Queen Mary* was not requisitioned at that time. There is nothing to prohibit the inference that the captains of defendants' boats did have the freedom of choice of storing the fish in the government refrigeration plant in the Canal Zone, or of dumping them which was done with the damaged cargo of a ship not involved here, which had been hit by gunfire, or of consenting to the trans-shipment on the *Queen Mary*. If the defendants were not willing to have their fish trans-shipped on the *Queen Mary* or did not intend to pay for the transportation the least they could have done was to protest the transfer or announce that they did not intend to pay transportation charges. They did neither.

The *Queen Mary* was not requisitioned but was left in command of her own officers and was operated by her own civilian crew. *Her captain was given sealed orders to be

opened after she was at sea. These orders were not available at the trial and we are not informed as to their contents. Thus the extent that the *Queen Mary* was sailing under compulsion, if any, from the Navy does not appear.

It is generally held that the existence of an implied contract is usually a question of fact for the trial court. Where evidence is conflicting, or where reasonable conflicting inferences may be drawn from evidence which is not in conflict, a question of fact is presented for decision of the trial court. Here, reasonable conflicting inferences might have been drawn from the evidence. As the trial judge drew the reasonable inference in favor of plaintiffs, and as the existence of an implied contract was a question of fact for the trial court, its decision on that question is conclusive here. (*Caminetti* v. *National Guar. Life Co.*, 56 Cal.App.2d 92 [132 P.2d 318]; *Silva* v. *Providence Hospital of Oakland*, 14 Cal.2d 762 [97 P.2d 798].)

Further, on appeal we must draw all reasonable inferences in favor of the judgment. (*Mah See* v. *North American Acc. Ins. Co.*, 190 Cal. 421 [213 P. 42, 26 A.L.R. 123]; *Estate of Bristol*, 23 Cal.2d 221 [143 P.2d 689].) As the trial judge resolved the conflicting inferences in favor of plaintiffs, and as there are reasonable inferences supporting the judgment, we cannot disturb it here.

Judgment affirmed.

Barnard, P. J., concurred.

A petition for a rehearing was denied August 19, 1946, and appellants' petition for a hearing by the Supreme Court was denied September 19, 1946.