[Civ. No. 23195. Second Dist., Div. Two. Jan. 15, 1959.]

C. F. BOLSTER COMPANY (a Partnership), Respondent, v. J. C. BOESPFLUG CONSTRUCTION COMPANY (a Corporation) et al., Appellants.

Monteleone & McCrory for Appellants.

Mantalica, Barclay & Teegarden and Lewis C. Teegarden for Respondent.

HERNDON, J.—In the court below plaintiff, C. F. Bolster Co., a subcontractor, recovered judgment against defendant, J. C. Boespflug Construction Company, the general contractor, and The Travelers Indemnity Company, its surety, for extra work allegedly done by plaintiff at defendant contractor's direction in the construction of certain school buildings for the Los Angeles City High School District. By the terms of a subcontract, dated October 12, 1954, plaintiff undertook to do the interior and exterior plastering work on the project in conformity with and subject to the plans and specifications for the agreed sum of $201,914.

In substance, the trial court found that at defendant's instance and request plaintiff had applied an extra leveling coat of cement plaster to the exterior concrete surfaces of said buildings and that the reasonable value of the labor and materials utilized therein was $8,135.96. The effect of the findings was to sustain plaintiff's contention that the extra work was necessitated by defendant's failure properly to prepare the concrete surfaces so that "irregularities" therein would not show through the two coats of plaster called for by the specifications.

The subcontract incorporates by reference the plans and specifications on the project which were prepared by the architect, Mr. A. C. Zimmerman. (See *Enochs* v. *Christie*, 137 Cal.App.2d Supp. 887, 889 [291 P.2d 200]; *Bell* v. *Rio Grande Oil Co.*, 23 Cal.App.2d 436, 440 [73 P.2d 662].) Under the terms of the specifications so incorporated, all materials furnished and work done were subject to the architect's inspection and approval for the owner. The architect was declared to be the interpreter of the specifications and the judge of the quality of materials, workmanship and performance.

An entire section of the specifications, section "K," deals with the plastering work which was plaintiff's responsibility under the subcontract. This section required plaintiff to apply two coats of plaster: first a "brush coat" which was essentially a coat of paint consisting of colored stucco without sand; and, second, a "dash coat," which was described in the testimony as a soupy mortar mix sometimes applied with a "dash brush." The specified thickness of the dash coat was 3/32 of an inch and it was provided that "[t]he dashing shall be done with a plasterer's dash brush using a strong whipping motion to secure a good bond." It was provided in paragraph 56 of section "K" that "[a]t least one week prior to starting the work, the contractor shall make up samples of stucco work

under the direction of the architect. The finished work shall match the approved samples in color and texture.''

The specifications (section K) require that ''Concrete surfaces to be plastered shall be finished, cleaned and sandblasted as specified in the section on Portland Cement Concrete. Before starting plastering, the subcontractor for the work of this section shall inspect all surfaces to be plastered and report to the contractor and inspector any surfaces to be plastered which have not been prepared for plastering as specified . . .''

On February 11, 1955, plaintiff wrote defendant a letter reading as follows: ''On the above project, we would like permission to machine apply the exterior stucco coat. It has been our experience, and the experience of the industry as a whole, that machine application produces a finished surface that is much superior to hand application. There will be no change in price.'' It will be noted that the foregoing requested a change from the method of application required by the above quoted section of the specifications which provided for application of the dash coat ''with a plasterer's brush.'' Defendant transmitted the above letter to the architect on February 15, 1955, who wrote defendant as follows:

''Where stucco dash coat is specified, (Par. 55, Sec. K, Contract Specifications), the Architect will approve the application of stucco by machine, provided it is an air spray machine and the exterior woodwork is properly masked. A demonstration of the method of masking and application will have to be approved by the Inspector and the Architect before starting the stucco work. If the methods are approved, the Architect will process a change order to the above-referenced paragraph. Par. 56, Sec. K, Contract Specifications, requires samples of stucco work. If possible, these samples should be made at the time the machine application is demonstrated. As to the texture of the dash coat, the Architect has in mind a texture produced by a slight troweling of the dash coat. When you get ready to make the samples, the Architect will give you the address of a building to look at.''

Defendant promptly transmitted the architect's letter to plaintiff, and subsequently notified plaintiff of the building to which the architect referred. The pretrial stipulation recites that the specifications were modified to permit plaintiff to apply the stucco by means of a gun instead of by hand.

The section of the specifications on Portland Cement Concrete, section ''E,'' (to which the above quoted plastering specifications referred) deals with the requirements of the con-

crete work for which *defendant* was responsible in this case. The provisions of this section required defendant to grind down or otherwise remove fins, pour lines, bulges, stains and irregularities of surfaces, and to sandblast the concrete surfaces which were to be plastered. It was further provided that "In addition, all exterior surfaces to be plastered with a dash coat shall have all irregularities removed which will show through the dash coat of plaster . . ."

There is substantial evidence in the record, both testimonial and photographic, tending to prove the unsatisfactory conditions of the concrete surfaces of the exterior walls which defendant constructed and on which plaintiff was obligated to apply plaster. There is testimony as to the existence of excessive numbers of ridges, protrusions, indentations, and other irregularities on the surface of the concrete which had to be removed by grinding or sandblasting operations conducted by defendant. And there is evidence that as a result of the sandblasting operations, there was considerable pitting and scoring of the concrete surfaces on which plaintiff was required to work.

Plaintiff offered expert testimony to prove that two coats of plaster, consisting of a brush coat and a 3/32-inch dash coat, as called for by the specifications, would not cover the irregularities and imperfections in the concrete surfaces as prepared by defendant. There is testimony by an ex-employee of defendant which gives substantial support to plaintiff's contention that defendant was having serious difficulty in bringing the concrete surfaces up to specifications. This witness testified that at the time the concrete work was done he was defendant's construction superintendent on the job; that when the forms were removed "the concrete was in fair condition, except, when we started sandblasting, it opened a lot of voids, and that required a lot of filling"; that in his opinion a 3/32-inch dash coat of stucco would not have been sufficient to cover the imperfections, and that his estimate of the cost of putting the concrete in shape so that the imperfections would be satisfactorily covered by the specified dash coat "would run around ten to twelve cents a square foot." The witness testified to conversations with plaintiff's representatives in which various methods of preparing the concrete surfaces for the application of plaster were discussed.

In June, 1956, plaintiff's employees prepared a number of samples of external stuccoing on a wall of one of the buildings which defendant had constructed. Among these samples

were examples of both hand and machine application, including one consisting of a brush coat and a dash coat applied by hand as called for in the specifications. When these several samples were submitted to the architect for his approval, he rejected all except one which had been prepared by machine application with *three* coats of plaster. This sample had been prepared by the application of a machine-applied base or "float" coat of plaster considerably thicker than the dash coat called for in the specifications, followed by two machine applied dash coats.

In late July or early August defendant requested a bid from plaintiff for preparing the external concrete surfaces for the admitted purpose of avoiding any dispute as to responsibility for preparing the concrete surfaces. On August 18, 1955, plaintiff replied by letter with an offer to apply a "leveling coat" of plaster to the external concrete surfaces at an additional cost of $11,368. Defendant did not immediately respond to this offer. However, on September 28, 1955, defendant wrote to plaintiff as follows:

"With reference to your letter of August 18, 1955, regarding application of a leveling coat to exterior concrete surfaces, this is to advise that no such change was requested or authorized by this office.

"Subsequent to receipt of your letter the architect inspected the concrete surfaces of the buildings to receive dash coat and has approved the surfaces as fully complying with the requirements for preparation of concrete surfaces outlined in Section E of the contract specifications.

"The architect, at the same time, selected and approved one of the samples that you applied over said surfaces. This application of stucco dash coat will be applied by you in strict accordance with the specifications, particularly, Section K, and must meet with the architect's approval. Earlier in the year the architect gave conditional approval of a machine application for the dash coat, provided that such application first be approved by him. If it is impossible for you to secure a satisfactory and approved job, using mechanical methods, it may be necessary to revert to hand methods outlined in the specifications, which is your responsibility under the terms of our subcontract."

Plaintiff replied the following day as follows: "In accordance with our subcontract for plastering on the above mentioned construction, we are now, and have been for some time, ready to proceed with the application of dash coat of

plaster on exterior concrete walls but have been unable to do so because surfaces have not been prepared for plastering. Pursuant to our contract and the specifications, we do hereby report to you that the concrete surfaces to be plastered have not been prepared for plastering as specified in the section of specifications on concrete Portland Cement. This surface preparation to be done is a part of Portland Cement concrete work as set forth in Section E, Paragraph 1-G and Section E, Paragraph 77 of specifications. This report is hereby given you pursuant to Section K, Paragraph 48 of specifications. When surfaces have been prepared, we shall proceed forthwith with the dash coat. Delay on your part is preventing us from proceeding and is resulting in additional costs to us in performance of our subcontract.''

The foregoing assertions by plaintiff that the concrete surfaces were not properly or adequately prepared provoked a reply from defendant on October 4, 1955, in which defendant insisted that the concrete surfaces fully complied with the requirements of section ''E'' of the specifications, and proceeded to identify the buildings which were or would be ready to receive the plaster. The letter concluded: *''You are herewith requested to proceed with your work as directed* and cooperate in a proper manner to complete this job to our mutual advantage and preclude any further delays.'' (Emphasis added.)

Plaintiff replied to the letter of October 4 by letter dated October 13, 1955, stating: ''Pursuant to the request contained in your letter of October 4, 1955, we are 'proceeding with the work as directed' by you. Before we can properly apply the dash coat as provided in the specifications, it is necessary that certain preparatory work be done to put the surfaces in a condition to receive the dash coat. At your request, we have begun such preparation, which consists of applying a stucco float finish to cover imperfections and irregularities in the concrete. Obviously there is a dispute between us concerning responsibility for doing the work above described, and it is our contention that such preparatory work is not a part of the plastering specifications. However, at your request we are proceeding with the work. The dispute can be resolved upon completion of the contract. In the meantime for our own protection, we are treating this preparatory work as extra work and will bill you accordingly.''

It does not appear that defendant made any reply to the last quoted communication. Plaintiff thereafter proceeded

with the plastering of the exterior walls of the four buildings utilizing the base or "float" coat described above followed by the application of two "dash" coats. In other words, plaintiff followed the method of application used in producing the sample which the architect had approved.

Both in the trial court and on this appeal, defendant has insisted most vigorously that the exterior plastering work for which plaintiff is compensated by the judgment at bar was neither requested by defendant nor necessitated by defective concrete surfaces, but was required by the inspector and architect as a condition of granting plaintiff's request for permission to apply the plaster by a machine method in lieu of the hand method called for in the specifications. This contention centers upon an issue of fact and constitutes an attack upon the trial court's Finding of Fact Number IX which reads as follows: "In addition to the work required of plaintiff under the terms of said subcontract and at the request of the defendant, J. C. Boespflug Construction Company, the plaintiff performed extra services and supplied extra materials consisting of an additional coat of cement plaster to all of the exterior concrete surfaces of the buildings at Westchester High School. By reason of said extra work, plaintiff's costs were increased and the reasonable value of said labor and materials is the sum of $8,135.96. Said sum became due and payable on September 16, 1956."

Our review of the record convinces us that the challenged finding is amply sustained by substantial evidence.

It is clear from the recited evidence that as late as mid-October, 1955, plaintiff and defendant were in disagreement as to what performance by plaintiff would be necessary in order to produce exterior wall surfaces which would conform to the requirements of the specifications and meet with the approval of the architect. There was abundant evidence that the concrete surfaces as they appeared in August were quite unsuitable to receive the application of plaster. Defendant's request for plaintiff's bid on the job of preparing the concrete could be construed most reasonably as indicating defendant's recognition that extra work was necessary. It bears repetition that the architect previously had rejected the sample of stucco work consisting of two coats applied in the manner prescribed in the original specifications and had approved a three-coat sample applied in the manner later followed by plaintiff in completing the work. It may be inferred from the evidence that defendant was fully informed concerning the architect's

declarations in this regard. Defendant was advised by plaintiff's letter of October 13 that plaintiff considered itself under direction to apply the plaster in the manner which the architect had approved. In these circumstances, particularly in view of the urgency of the situation then existing, the last paragraph of defendant's letter of October 4 instructing plaintiff to proceed "as directed" was susceptible to interpretation as a demand that plaintiff proceed without further delay to apply the stucco in a manner that would satisfy both the architect and the specifications.

■ Extra work as used in connection with a building contract means work arising outside of and entirely independent of the contract—something not required in its performance, not contemplated by the parties, and not controlled by the contract. (*Frank T. Hickey, Inc.* v. *L.A.J.C. Council,* 128 Cal.App.2d 676, 683 [276 P.2d 52] ; *City Street Imp. Co.* v. *Kroh,* 158 Cal. 308, 321, 323 [110 P. 933] ; see 6 Cal.Jur. 370, § 224.) ■ Extra work may be performed by the contractor for the owner (*Punton* v. *Sapp Bros. Construction Co.,* 143 Cal. App.2d 696, 701 [300 P.2d 271] ; *Parkford* v. *Union Drilling Co.,* 118 Cal.App. 538, 544 [5 P.2d 440]) or by the subcontractor for the general contractor. (*Frank T. Hickey, Inc.* v. *L.A.J.C. Council, supra,* 128 Cal.App.2d 676, 683-685.)

■ Where the extras are of a different character from the work called for in the contract and no price is agreed on for extra work, their reasonable value may be recovered. (*Parkford* v. *Union Drilling Co., supra,* 118 Cal.App. 538, 544; 17 C.J.S. 854, § 371, h.) In the instant case, as we have pointed out, the finding that extra work was required by the defendant is supported by substantial evidence to be found in the circumstances, in the communications attending the controversy and in the construction apparently placed on the contract by the parties as indicated by their conduct. (*Cf. Wyman* v. *Hooker,* 2 Cal.App. 36, 41 [83 P. 79] ; *Punton* v. *Sapp Bros. Construction Co., supra,* 143 Cal.App.2d 696, 701; *Frank T. Hickey, Inc.* v. *L.A.J.C. Council, supra,* 128 Cal.App.2d 676, 681-683.) Considering all the circumstances appearing from the record, it was not unreasonable for the trial judge to conclude that the extra work on the building was done at defendant's direction, that it was necessitated by imperfect performance of concrete work for which defendant was responsible and that defendant was fully aware that the architect's requirements could not be fulfilled without doing the extra work. (See *Bavin & Burch Co.* v. *Bard,* 81 Cal.App. 722, 728-729 [255 P. 200] ; *Frank T.*

*Hickey, Inc.* v. *L.A.J.C. Council, supra*; 9 Cal.Jur.2d 296, § 13.)　The resolution of these purely factual questions is within the exclusive province of the trier of the facts. (See *Greenwald* v. *Royal Indemnity Co.*, 112 Cal.App.2d 183, 185 [245 P.2d 1115]; *Lowry* v. *Law*, 27 Cal.App. 483, 492 [150 P. 660].)　Since the findings are supported by substantial evidence this court is without power to substitute its deductions for those of the trial judge. (*Primm* v. *Primm*, 46 Cal.2d 690, 693-694 [299 P.2d 231]; *Crawford* v. *Southern Pac. Co.*, 3 Cal. 2d 427, 429 [45 P.2d 183]; *New* v. *New*, 148 Cal.App.2d 372, 383 [306 P.2d 987].)

　Defendant contends that a provision of the subcontract requiring a written change order specifying any extra work to be done bars any recovery by plaintiff. Section 12 of the subcontract provides as follows: ''No claims for extra work . . . will be recognized or paid for unless agreed to in writing before the work is done . . . in which writing shall be specified in detail the extra work or changes desired, . . .'' Since no written authorization of this character was given, it is defendant's argument that plaintiff was required to plead and prove a waiver of this condition. (See 25 Cal.Jur. 931, § 6.)　It is settled, however, that this requirement of pleading is satisfied by the allegation of facts which would constitute a waiver. (*Estrada* v. *Queen Ins. Co.*, 107 Cal.App. 504, 508 [290 P. 525].)　In the instant case the complaint incorporated the subcontract, including the requirement of a writing in connection with any extra work, and alleged ''that in addition to the work required to be done by plaintiff under the terms of said subcontract, and at the special instance and request of the defendants, the plaintiff applied a leveling coat of cement plaster to the . . . buildings . . .'' This pleading of a waiver is sufficient. (*Estrada* v. *Queen Ins. Co., supra*, 107 Cal.App. 504, 508.)

　The second phase of defendant's argument on this point is that the evidence is insufficient to sustain the finding of a waiver by defendant of the required writing. However, we have found the evidence sufficient to support the finding that the extra work was done at defendant's special instance and request. Plaintiff previously had submitted a written offer to do this work for a specified amount. Defendant thereafter directed plaintiff to proceed without referring to the necessity of compliance with the requirement of section 12 of the subcontract. It has been held that proof of similar conduct is sufficient to support the finding of a waiver. (*Wilson* v.

*Keefe,* 150 Cal.App.2d 178, 181 [309 P.2d 516] ; *cf. Frank T. Hickey, Inc.* v. *L.A.J.C. Council, supra,* 128 Cal.App.2d 676, 682-683 ; and see 9 Cal.Jur.2d 296, § 13.) As stated in *Wyman* v. *Hooker,* 2 Cal.App. 36, 41 [83 P. 79] : ''The evidence showed that the extra work on the building was done with the knowledge and consent of defendant and his agent, and that they waived the written stipulation that a separate written estimate of extra work should be submitted, by orally agreeing to and countenancing the work without written estimates.''

 It was a purely factual question whether plaintiff adequately complied with the contractual provision requiring it to report to the contractor any surfaces not properly prepared before starting to plaster. It is implicit in the findings that the trial court resolved this issue in plaintiff's favor. Apart from the written communications from which we have quoted in our recital of the evidence, the record reveals that there were various discussions between the parties during the summer of 1955 in which the imperfections in the concrete surfaces were extensively discussed. Obviously, we cannot say that this evidence was insufficient to support a finding that the condition under discussion was adequately fulfilled. The same disposition must be made of defendant's argument that the extra work was occasioned solely by the change from the hand method to the machine method of application.

While it is true that the architect was constituted ''the judge of the quality of materials and workmanship,'' his approval of the concrete surfaces could not properly be regarded as a binding adjudication of the issues which the trial court was called upon to decide in this case. There was no reason to believe that the architect as representative of the school district would ultimately have accepted buildings which failed to measure up to prescribed standards. It seems reasonable to conclude that as of mid-October, 1955, neither plaintiff nor defendant could predict with assurance whether or not the architect would accept the buildings after an application of the stucco in the manner provided by the original specifications. Indeed, the architect's rejection of a sample prepared in that way was a fact sufficient to support a finding that he probably would not have accepted them. At that time both plaintiff and defendant were faced with the necessity of making immediate decisions on the basis of their respective evaluations of the requirements of the specifications and of the conditions presented. Completion time was running out, and

there appeared to be ample basis for apprehension of substantial liabilities in the event of further delay. It was within the sole province of the trial court to determine the factual questions upon which liability here depended: what quality of performance was being demanded of plaintiff; what methods were appropriate or essential to accomplish acceptable performance; whether extra work was necessary, and, if so, whether it was necessitated by faulty concrete surfaces or by plaintiff's choice of method, and whether plaintiff reasonably complied with the conditions on its part to be performed.

 "It is generally held that the existence of an implied contract is usually a question of fact for the trial court. Where evidence is conflicting, or where reasonable conflicting inferences may be drawn from evidence which is not in conflict, a question of fact is presented for decision of the trial court. (*Medina* v. *Van Camp Sea Food Co.*, 75 Cal.App. 2d 551, 555-556 [171 P.2d 445]; *Caron* v. *Andrew*, 133 Cal. App.2d 412, 416 [284 P.2d 550].)

The judgment is affirmed.

Fox, P. J., and Ashburn, J., concurred.

A petition for a rehearing was denied February 4, 1959, and appellants' petition for a hearing by the Supreme Court was denied March 11, 1959.