19652

CAROLINA MECHANICAL CONTRACTORS, INC., Respondent, v.
YEARGIN CONSTRUCTION COMPANY, INC., Appellant

(198 S. E. (2d) 224)

2

*Messrs. Haynsworth, Perry, Bryant, Marion & Johnstone,*
of Greenville, *for Appellant,* cite:

*Messrs. Horton, Drawdy, Dillard, Marchbanks, Chapman & Brown,* of Greenville, *for Respondent,* cite:

4

*Messrs. Haynsworth, Perry, Bryant, Marion & Johnstone,* of Greenville, *for Appellant,* in Reply.

July 9, 1973.

LITTLEJOHN, Justice:

This action in contract arises out of the construction of McAlister Square Shopping Center in Greenville. Yeargin Construction Company, Inc., the defendant, was the general contractor and subcontracted all of the mechanical work (air conditioning, plumbing, etc.) to Carolina Mechanical Contractors, Inc., the plaintiff.

At issue in the trial were questions involving the nature and extent of agreements between the parties and the validity of claims for additional work asserted by the plaintiff.

The shopping center construction project was started in the spring of 1967 without agreements in writing. The owners, in the fall of 1966, were trying to find a means to finance the project and needed a proposed dollar figure with which to approach lending institutions. The defendant was asked by the owners to give a figure, which at most could only be a rough estimate, and was promised the general contract for the project if it could be financed and built. In order for the defendant to supply the overall figure, it was necessary for it to procure estimated proposals from subcontractors. The plaintiff, as a potential subcontractor of the mechanical work, was asked by the defendant to supply a figure. To accomplish all of this, drawings of other similar shopping centers were used as a basis for arriving at estimated figures. At that point neither the owners, nor the general contractor, nor the subcontractors knew with any detail the requirements of stores and shops that were to be constructed. Plaintiff submitted to the defendant a figure of $1,079,348.00 for the mechanical work. The letter, dated October 19, 1966, submitting the figure, contained the following paragraphs:

"We are pleased to quote you a price of One million seventy-nine thousand three hundred forty-eight ($1,079,348-.00) dollars for furnishing and installing Site Utilities, Plumbing, Drainage, Heating and Air Conditioning, Fire Protection and miscellaneous items of mechanical requirements in accordance with the attached outlined specifications.

"Our price for furnishing and installing these mechanical systems is based on the information that has been furnished us to date. The final price shall be adjusted in accordance with the final design requirements."

After financing was assured, work was started by both the contractor and the subcontractor on oral authorization. Thereafter, on July 14, 1967, the defendant sent a letter to the plaintiff as follows:

"This letter is to authorize you to proceed with any necessary arrangements concerning the performance of mechanical work on the above job. A formal Purchase Order and Subcontract Agreement will be issued to you at a later date when all of the proper details have been worked out."

Work proceeded on the shopping center under this arrangement until October 16, 1967. By that time, the plaintiff had submitted and the defendant had honored some $500,000.00 in invoices. Payments were made on a cost-plus basis. The arrangement was a satisfactory one and the project proceeded with haste. On October 16, 1967, the defendant submitted to the plaintiff a purchase order and a contract, which were signed by the parties. [1] Defendant now

---

[1] The purchase order was on a form printed for the defendant. It provided as follows:
"THIS ORDER ISSUED FOR ACCOUNTING PURPOSES ONLY TO COVER ALL NECESSARY LABOR, MATERIALS, ETC., FOR WORK AS DETAILED:
'Furnish all labor, materials, tools, equipment, transportation, supervision, taxes, insurance, etc., as may be required to perform the following work: Furnish and install sanitary sewer, domestic water, outside fire protection, interior plumbing and drainage, heat, air conditioning and ventilation work, pipe and duct insulation work, and interior fire protection work on the above job in accordance with your Proposal dated October 19, 1966 based on the attached list of drawings covering the above project complete on a cost plus basis, not to exceed the

claims these constituted a final and binding contract, into which merged all prior agreements. On the other hand, plaintiff claims that the contract was merely a memorandum.

The whole project was a "hurry up" undertaking, and many changes in plans were effected on an informal basis. When the shopping center was completed, plaintiff presented some $225,000.00 in claims for extras. This was over and above the $993,753.00 [2] referred to in the contract. The defendant approved and paid more than $130,000.00 and disallowed the balance. This suit was commenced to collect the balance of $112,965.64 alleged to be still owed the plaintiff by the defendant.

By agreement of counsel, the case was tried without a jury before the judge. After taking testimony, which required

guaranteed maximum sum of $993,753.00. The estimated guaranteed price for the above work is $900,753.00.

'Any savings between the actual cost of the work and the estimated guaranteed maximum will be shared 10% to Carolina Mechanical Contractors and 90% to the job account. Basis of cost plus work is to be as follows: Job cost plus 11% on all items except equipment with unit cost over $5,000.00 and on subcontractors working for Carolina Mechanical. This to be handled on 5% mark up on Carolina Mechanical.

'Work to be invoiced once each month on a cost plus fee basis. Should the project need it, up to ½ of the fee can be called for by Yeargin and retained until after completion of the job. Six and a half (6½%) percent interest will be paid on this money, should it be needed. The other one half of fee to be held by Yeargin Construction Company.

'Note: All work to be performed in accordance with plans and specifications and as required by job progress, also as directed by the job superintendent.' "

The accompanying contract was also on one of the defendant's forms printed for use when it, the defendant, subcontracted work. Sections 4 and 13 were as follows:

(4) "The Contractor agrees that it will pay to the Subcontractor in accordance with provisions of Section 5 hereof, and subject to any increase or decrease resulting from changes that may be agreed upon in writing between the parties the sum of NINE HUNDRED NINETY THREE THOUSAND SEVEN HUNDRED FIFTY THREE DOLLARS ($993,753.00)."

(13) "Claims for extras will only be allowed where written authorization has been given prior to execution of the work. When such authority is given without a proposal the full claim must be submitted promptly upon completion of the extra work."

[2] The $993,753.00 figure represents the $1,079,348.00 figure quoted in the October 19, 1966 letter minus $75,595.00 for a storm drainage system and $10,000.00 for a fire alarm system, both of which were included in the 1966 proposal and subsequently deleted as a responsibility of the plaintiff.

six full days, the trial judge took the case under advisement. Thereafter, he granted judgment in favor of the plaintiff in the amount of $33,546.69, with interest. This amount represented a total of ten items; he rejected the rest of plaintiff's claims. It is from this order that the defendant has appealed.

The defendant challenges the trial judge's findings that the contract and purchase order of October 16, 1967 was not the sole agreement between the parties; that the alleged extras could be considered in the same category as other extras claimed by plaintiff and paid by the defendant; and that the plaintiff was entitled to $33,546.69 in extras. Defendant also asserts that it is due certain credits and that plaintiff should have been required to account for an alleged contingency fund included in the alleged guaranteed maximum contract price.

From the inception, the financing, planning and construction of the shopping center was done in a piecemeal manner. The record fairly indicates that only a facsimile of the final plans and specifications were completed prior to commencement of construction. This is understandable because the owners did not know in the beginning that tenants would occupy a great portion of the space to be provided. Firm plans and specifications were delivered to the general contractor as definite phases of construction began.

It is apparent from the record that a great deal of confusion existed over what type contract was entered into and, for that matter, as to just what would constitute the contract itself. The record is full of references to a cost-plus contract, to a guaranteed maximum contract, and to a combination guaranteed maximum cost-plus contract. In describing the relationship, the trial judge stated in his order:

"The situation is not one . . . where the parties sought to merge all prior verbal negotiations into a single contract agreement prior to commencing work. Rather, . . . the papers were more like a memorandum of the arrangement

under which Carolina [plaintiff] had already performed nearly half its work."

Since the case is one at law, tried by counsel before the trial judge without a jury, the scope of this Court's review is limited. It is a sound principle of law, approved by this Court, that when an action at law is by agreement of the parties tried by a judge without a jury, his findings of fact have the force and effect of a jury verdict, and are conclusive upon appeal when supported by competent evidence. *Beheler v. National Grange Mut. Ins. Co.,* 252 S. C. 530, 167 S. E. (2d) 436 (1969); *Reid v. Hardware Mut. Ins. Co. of Carolinas, Inc.,* 252 S. C. 339, 166 S. E. (2d) 317 (1969). And this Court will examine the record only to see if there is any competent evidence to support the findings of the judge. *Marsh Plywood Corp. v. Graham,* 240 S. C. 486, 126 S. E. (2d) 510 (1962).

When the question is: Did the parties assent to a particular writing as the complete and accurate integration of the contract? the question is one of fact. 3 Corrbin, Contracts § 573 (1960); 9 Wigmore, Evidence, § 2429 (3rd ed. 1940). And whether a paper is a memorandum or a written contract is a question for the jury, to be determined from the whole of the evidence. 3 Corbin, Contracts, § 588 (1960); *Walley v. Bay Petroleum Corp.,* 312 F. (2d) 540 (5th Cir. 1963). The instrument itself cannot give the whole answer; but where in express terms it says it is the entire agreement, then it is presumed to be the sole agreement. *Sanders v. Allis Chalmers Mfg. Co.,* 237 S. C. 133, 115 S. E. (2d) 793 (1960). The determination of whether the contract and purchase order constituted the entire contract was a question of fact.

The trial judge held:

"It appears equally clear that after the execution of the [October 16] 1967 papers, Yeargin and Carolina continued their work on the project on the same informal basis with

no appreciable change in the nature of their working relationship.

* * *

"The quality of Carolina's work is not questioned, nor is the fact that the owner enjoys the full benefit of it."

Under our view of the record, the finding by the judge that the contract and purchase order of October 16, 1967 was "more like a memorandum of the arrangement", is a reasonable inference that can be drawn from the evidence presented.

If section 13, quoted in footnote 1, was binding, we cannot say that the judge erred in holding that the same was waived. Although it is the settled law of this State that waiver must be pleaded in the complaint, *Hyder v. Metropolitan Life Ins. Co.*, 183 S. C. 98, 190 S. E. 239 (1937); *Satcher v. Woodmen of the World Life Ins. Soc.*, 199 S. C. 59, 18 S. E. (2d) 523 (1942), the requirement is not so strict as to insist upon the use of the word *waiver;* it is sufficient to allege the facts that constitute a waiver. See *Bolster Co. v. Boespflug Const. Co.*, 167 Cal. App. (2d) 143, 334 P. (2d) 247 (1959). The complaint does not expressly use the word *waiver,* but alleges in effect that defendant, pressing for rapid completion, assured plaintiff that "expenses resulting from any changes in designs, plans, and specifications made since plaintiff's proposal would be paid for as extras in the same manner as all other work called for under their agreement." We are of the opinion that these allegations of fact met the requirements that waiver be pleaded.

Whether the requirements of section 13 were waived was a factual determination for the judge in this case. The record fairly indicates that defendant did not demand strict compliance with section 13; it authorized the extras and accepted the benefits of them. We cannot say the defendant waived the requirements of section 13. See as a matter of law that the trial judge erred in finding that

*Wexler Const. Co. v. Housing Authority,* 144 Conn. 187, 128 A. (2d) 540 (1956).

The defendant argues that the trial judge committed error in considering the payment of $130,000.00 in extras by the defendant to the plaintiff as being in the same category as the claims which he allowed in the amount of $33,000.00 plus. When the judge's order is considered as a whole, we do not think that the judge in effect said the defendant must pay the $33,000.00 because it has already paid $130,000.00. We rather think that he was merely pointing out the fact that compliance with section 13 was ignored by the parties insofar as a portion of plaintiff's claim was concerned. We find no error of law.

An *extra,* as used in connection with a building contract, means work outside of and independent of the contract—something not required in the performance of the contract, not contemplated by the parties, and not controlled by the contract. *Bolster Co. v. Boespflug Const. Co., supra,* 334 P. (2d) at 252; *Hickey, Inc. v. Los Angeles Jewish Com. Coun.,* 128 Cal. App. (2d) 676, 276 P. (2d) 52 (1954). In this case, for the allowance of the extras to be sustained, the record need only reflect competent evidence that the alleged extras were not contemplated or included in the contract and were requested by the defendant.

The order of the lower court allowed the following ten claims for extras:

1. Furnishing and installing refrigeration equipment in Morrison's cafeteria ...............................$ 4,744.00
2. Furnishing and installing inner connection piping to Morrison refrigeration equipment ................ 2,903.59
3. Changing tank type water closets to flush valve type 1,456.00
4. Trip to Knoxville ....................................... 169.50
5. Relocation of sixteen (16) roof drain risers ......... 1,820.00
6. Chill water piping, etc. for seven (7) additional air conditioning units .......................... 4,935.00
7. Additional cost of canopy drains .................. 1,854.00
8. Relocate plumbing fixtures at Ivey's .............. 799.00
9. Domestic water supply ......................... 12,498.00
10. Furnishing Zurn roof drains with parabolic weirs and ERC accessories ..................... 2,367.60

It would serve no useful purpose to discuss the evidence pertaining to the first nine claimed extras. It is sufficient to say that there is no contention that they were not requested by the defendant, and there is at least a scintilla of evidence that each was added to the mechanical plans subsequent to the contract. Any contention that the trial judge erred in allowing claims one through nine is without merit.

Equally as apparent is the fact that claim number ten was included in the contract. The preliminary roof drainage plan, dated September 9, 1966, and furnished plaintiff for the purpose of calculating an estimated cost for the 1966 proposal, positively indicated that Zurn-Z-105 roof drains were required. A lesser drain was included due to an admitted mistake in cross-reference by the plaintiff. In effect, the alleged extra includes furnishing twenty-eight (28) Zurn-Z-105 roof drains and ERC accessories. It is uncontradicted that the ERC accessories were necessary for the proper installation of the drains and would need to be included in costing.

It is apparent from the record that Zurn-Z-105 drains or comparable products were to be included in plaintiff's 1966 proposal; that plaintiff made a mistake in costing the requirement; that for several locations defendant paid plaintiff for the increase in cost of the Zurn drains over the drains plaintiff had mistakenly figured in the 1966 proposal; and that defendant refused to pay, as an extra, for twenty-eight Zurn drains used in other locations.

The question thus becomes whether the payment for increased costs on some of the drains would also require payment of increased costs on the twenty-eight drains in this claim. We think not.

Completion of extra work and the subsequent payment for part would be a valid consideration in the question of payment for the remainder. This does not, however, apply to part payments made to help alleviate a minor mistake made in calculating the cost in a building

contract. Plaintiff was still bound by the 1966 proposal, which included Zurn-Z-105 drains; the drains cannot be classified as extras. We find the record void of competent evidence supporting the finding that the plaintiff was due $2,367.60 for furnishing the subject drains.

The defendant also takes exception to the lower court's failure to consider undisputed testimony that it was due credit for certain work and material. The alleged credits were for work and material not furnished, but which were included in the 1966 proposal. This lawsuit was brought in contract to secure payment for extras. Extras, as hereinabove discussed, are outside the contract. In a situation where a plaintiff supposedly owes a defendant monies, but nevertheless brings a suit in contract against the defendant, the proper defense to the action is a counterclaim or a set-off. It is fundamental that these affirmative defenses must be pleaded. Cases collected, 15 South Carolina Digest, Pleadings § 139 (1952, Supp. 1972). The defendant did not do so and, therefore, the trial judge properly disregarded any evidence concerning the alleged credits due.

The final exception concerns the trial judge's failure to require plaintiff to account for a $93,000.00 contingency alleged to be included in the guaranteed maximum. This is patently without merit as the defendant paid invoices in an amount at least equal to the sum of $993,753.00. We see no reason in law or equity why plaintiff should now be required to separate specific invoices.

Affirmed in part;

Reversed in part.

Moss, C. J., and LEWIS, J., concur.

BUSSEY and BRAILSFORD, JJ., concur in result.

BRAILSFORD, Justice (concurring):

I find no basis for holding that the contract executed by Yeargin on October 16, 1967, and accepted by Carolina

on November 6, 1967, which incorporated a purchase order and 110 guideline drawings, all of which were attached to the contract, was a mere memorandum. There is a strong presumption that this formally executed instrument was intended to be what its terms import, *i. e.*, the integration of the contract between the parties. The defendant insists upon the contract, with the incorporated documents, as merging all prior negotiations, and the plaintiff does not disavow it by either plea or proof. Its complaint seeks compensation for extra labor and material required by changes in the drawings on which the job was bid. This was also the tenor of Carolina's letter to Yeargin of March 7, 1968, claiming entitlement, according to an itimized list of "extra work and changes," to $225,110.00 in addition to the maximum price guaranteed by the contract.

Ironically, however, with the contract as my starting point, I arrive at the same result reached by Justice Littlejohn. Defendant's claim that the contract of November 6, 1967, forecloses plaintiff from claiming extra compensation for work either completed before that date or for which revised plans had been issued, is upon the theory that it was plaintiff's duty to recalculate its guaranteed maximum price, based upon changes then known to it, before signing the contract.

But this was not the proposal which defendant made and plaintiff accepted. Instead, in proposing the contract Yeargin incorporated the description of the work to be performed from Carolina's 1966 proposal and also incorporated the identical (with immaterial exceptions) 110 guideline drawings on which the earlier cost estimate had been calculated. This simply invited Carolina to reaffirm its earlier bid on the basis of information at hand in 1966, without the necessity of a recalculation based upon current designs and specifications.

Certainly nothing in the contract opposed this construction of the proposal unless, perhaps, Section 13. With re-

spect to this section, I agree that there is abundant evidence to support the trial judge's finding of waiver. Without disagreeing with Justice Littlejohn's conclusion that waiver was adequately pleaded, I point out that no exception raises the point that the complaint is deficient in this respect.

The charge that the court erred in not requiring plaintiff to account for "the $93,000.00 contingency included in its guaranteed maximum contract price" is simply not supported by the terms of the contract. The purchase order obligated the defendant to pay plaintiff on a cost plus basis not to exceed $993,753.00 based upon the list of drawings attached thereto. The contract further provided that plaintiff would be paid 10% of any savings between actual cost and $900,753.00, referred to as "the estimated guaranteed price." The so-called contingency is the difference of $93,000.00 between these two figures, as to which the contract imposed no obligation on plaintiff. This phase of the contract became wholly irrelevant as soon as actual cost exceeded $900,753.00.

I agree that the court did not err in failing to allow the defendant credits which were not demanded by its answer, and agree that there was some evidence to support each of the extras allowed by the trial judge except the tenth item. I therefore, concur in the result.

BUSSEY, J., concurs.